# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 24-50833

NORTH EAST INDEPENDENT SCHOOL DISTRICT,

*Plaintiff-Appellant,*

v.

I. M., by next friend Bianca R.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS (SAN ANTONIO)

## BRIEF FOR *AMICI CURIAE* COUNCIL OF PARENT ATTORNEYS AND ADVOCATES AND TEXAS ORGANIZATION OF PARENT ATTORNEYS AND ADVOCATES IN SUPPORT OF DEFENDANT-APPELLEE

SELENE ALMAZAN-ALTOBELLI
*Counsel of Record*
CATHERINE MERINO REISMAN
ELLEN SAIDEMAN
COUNCIL OF PARENT ATTORNEYS AND
ADVOCATES
*Attorneys for Amici Curiae*
P.O. Box 6767
Towson, Maryland 21285
(844) 426-7224

## *AMICI CURIAE*'S CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Amici Curiae* have no parent corporation, subsidiaries or affiliates that has issued shares to the public. *Amici Curiae* have no direct or indirect interest associated with the parties to this matter, or to their attorneys or counsel, though it and its members have a general interest in the issue and outcome of the case. *Amici Curiae* adopts the statements of the Appellees concerning the parties, trial judge(s), persons, firms, partnerships or corporations who have an interest in the outcome of the case. Pursuant to 5th Cir. R. 26.1.1, as this brief is filed by *Amici* the following is a list of all entities known to have an interest in the outcome of this appeal which has been "omitted from the certificate contained in the first brief filed and in any other brief that has been filed":

| | |
|---|---|
| *Amici Curiae*: | Council of Parent Attorneys and Advocates |
| | Texas Organization of Parent Attorneys and Advocates |

/s/Selene Almazan-Altobelli
Selene Almazan-Altobelli Esq.
Attorney for *Amici Curiae*

# TABLE OF CONTENTS

*AMICI CURIAE*'S STATEMENT OF INTERESTED PERSONS .......................... i

TABLE OF CONTENTS ............................................................. ii

TABLE OF AUTHORITIES ........................................................ iii

INTEREST OF *AMICI CURIAE* ................................................... 1

SUMMARY OF ARGUMENT ....................................................... 4

ARGUMENT .................................................................... 6

I.    IDEA REQUIRES THAT AN APPROPRIATE IEP BE REASONABLY
CALCULATED TO MEET ALL EDUCATIONAL NEEDS, BOTH ACADEMIC
AND FUNCTIONAL, OF A CHILD WITH A DISABILITY ................................ 6

II.   COURTS MUST APPLY THE *MICHAEL F.* FACTORS IN A MANNER
THAT IS CONSISTENT WITH *ENDREW F.* ........................................ 12

A. *Endrew F.* Clarified the Robust Substantive Standard for
Evaluating FAPE Claims .................................................... 12

B. *Endrew F.* Requires that the *Michael F.* Factors Be Applied so as to Require
IEPs to Contain Ambitious Objectives and Challenging Goals with Progress
Evaluated in Light of a Student's Unique Circumstances ..................... 16

CONCLUSION .................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*A.J.T. v. Osseo Area Schs.*, No. 24-249 (2025) ......................................................2

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006) .................2

*Bd. of Educ. v. Tom F.*, 552 U.S. 1 (2007) ..............................................................2

*Bd. of Educ. of East Windsor Regional Sch. Dist. v. Diamond*,
     808 F.2d 987 (3d Cir. 1986) ...............................................................19

*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*,
     458 U.S. 176, 189 (1982) ............................................................. *passim*

*Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*,
     118 F.3d 245 (5th Cir. 1997) ....................................................... *passim*

*E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754 (5th Cir. 2018) .................17

*Endrew F. v. Douglas County Sch. District RE-1*,
     580 U.S. 386 (2017) .................................................................... *passim*

*Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009) ................................................2

*Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154 (2017)..............................................1, 2

*Honig v. Doe*, 484 U.S. 305 (1988) .........................................................................8

*Perez v. Sturgis Public Schs.,* 598 U.S. 142 (2023)..................................................2

*Richardson Indep. Sch. Dist. V. Michael Z.*, 580 F.3d 286 (2009) ........................19

*Schaffer v. Weast*, 546 U.S. 49 (2005)......................................................................2

*Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 (2007)......................................2

**Statutes**

20 U.S.C. § 1400, *et seq.*.................................................................... *passim*

20 U.S.C. § 1400(c) ...............................................................................21

20 U.S.C. § 1400(d)(1)(A) .............................................................. 5, 11, 21

20 U.S.C. § 1401(14) ...............................................................11

20 U.S.C. § 1401(26) .................................................................7

20 U.S.C. § 1401(29) ............................................................ 7, 11

20 U.S.C. § 1406(b)(2)...............................................................8

20 U.S.C. § 1414 .....................................................................17

20 U.S.C. § 1414(d)(1)(A)(i)(I)-(III) ........................................10

20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(IV) ................................ 10, 14

29 U.S.C. § 794 ......................................................................1, 2

42 U.S.C. § 1983 ....................................................................1, 2

42 U.S.C. § 12131, *et seq* ................................................. *passim*

Pub. L. No. 94-142, 89 Stat. 773 ...............................................6

Pub. L. No. 105-17, § 101, 111 Stat. 37 (1997)..........................9

**Rules**

Fed. R. App. P. 29 .....................................................................1

**Legislative History**

*Education for All Handicapped Children, 1973-74: Hearings on S.6 Before the Subcommittee on the Handicapped of the Senate Committee on Labor and Public Welfare,* 93d Cong., 1st Sess. (1973-74) ................................................6

H.R. Rep. No. 332, 94th Cong., 1st Sess. (1975) ......................7

H.R. Rep. No. 94-332 (1975)...................................................10

*Hearings on S. 6 before the Subcommittee on the Handicapped of the Senate Committee on Labor and Public Welfare*, 94th Cong., 1st Sess., 1 (1975) ..........6

S. Rep. No. 168, 94th Cong., 1st Sess. 5-8 (1975) reprinted in 1976 U.S.C.C.A.N. 1425 ..........................................................................................7

Senator Randolph, Hearings on S. 6 before the Subcommittee on the Handicapped of the Senate Committee on Labor and Public Welfare, 94th Cong., 1st Sess., 1 (1975)....................................................................................................................6

**Other Authorities**

Brief for Council of Parent Attorneys and Advocates, et al. as Amici Curiae in Support of Petitioner, *Endrew F. v. Douglas Cent. Sch. Dist. RE-1*....................13

Mark C. Weber, *All Areas of Suspected Disability*, 59 Loyola L. Rev. 289 (2013) ........................................................................8, 9

United States Department of Education, *Questions and Answers (Q&A) on U.S. Supreme Court Case Decision Endrew F. v. Douglas County School District RE-1* (Dec. 7, 2017) ...............................................................................................13

**Regulations**

34 C.F.R. § 300.302. ............................................................................................19

## INTEREST OF *AMICI CURIAE*[1]

Council of Parent Attorneys and Advocates (COPAA) is a national not-for-profit organization for parents of children with disabilities, their attorneys and advocates. COPAA does not undertake individual representation but provides resources, training, and information for parents, advocates, and attorneys to assist in obtaining the free appropriate public education (FAPE) that children are entitled to under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* (IDEA).[2] COPAA also supports its members in their efforts to safeguard the civil rights guaranteed to those individuals under federal laws, including the Civil Rights Act of 1871, ch. 22, 17 Stat. 13 (codified as amended at 42 U.S.C. § 1983) (Section 1983), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Section 504), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* (ADA). COPAA brings the unique perspective of parents, advocates, and attorneys for children with disabilities. COPAA has filed as *amicus curiae* in the United States

---

[1] Pursuant to Fed. R. App. P. 29, *Amici* certify that no party's counsel in this matter authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amici* and their members and counsel contributed money intended to fund the brief's preparation or submission.

[2] The statute was originally named the Education of the Handicapped Act or EHA; it was renamed IDEA in 1990. *See Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 160 n.1 (2017). For the sake of simplicity, we refer only to IDEA in this brief. *Id.*

Supreme Court, including in *A.J.T. v. Osseo Area Schs.*, No. 24-249 (2025); *Perez v. Sturgis Public Schs.,* 598 U.S. 142 (2023); *Endrew F. v. Douglas County Sch. District RE-1*, 580 U.S. 386 (2017); *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154 (2017); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009); *Bd. of Educ. v. Tom F.*, 552 U.S. 1 (2007); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006); *Schaffer v. Weast*, 546 U.S. 49 (2005); and *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 (2007), and in all the United States Courts of Appeal that frequently hear special education appeals.

The Texas Organization of Parent Attorneys and Advocates (TOPAA) is a not-for-profit Texas organization for attorneys and advocates representing parents in Texas. TOPAA's mission is to empower students with disabilities and their families by assisting them in asserting and protecting their educational rights through training, resources, and legislative advocacy. While TOPAA does not represent children with disabilities directly, it does provide resources, training, and information for parents, advocates, and attorneys to assist in obtaining the FAPE such children are entitled to under IDEA. TOPAA also supports individuals with disabilities, their parents, and advocates in attempts to safeguard the civil rights guaranteed to those individuals under federal laws, including Section 1983, Section 504, and and the ADA.

TOPAA's interest in this case is its deep commitment to ensuring that all children with disabilities receive the FAPE to which they are entitled, which includes the right to extended school year (ESY) services when appropriate. In circumstances such as those presented in this case, ESY services are vital to allowing students with disabilities to succeed and in obtaining obtain an education alongside their non-disabled peers. TOPAA's advocacy on behalf of students with disabilities in Texas gives it a unique perspective on the issues presented.

*Amici's* interest in this case stems from their commitment to ensuring that students with disabilities have access to a free appropriate public education in all areas of disability with programming reasonably calculated to result in academic and functional progress. The district court correctly determined that the Northeast Independent School District (NEISD or District) failed to provide a FAPE to I.M., a non-verbal autistic child receiving special education services in a self-contained life skills classroom, because I.M. was not progressing on functional goals. Amici support the district court's correct interpretation and application of the *Endrew F.* decision in this case, securing I.M.'s right to a FAPE.

Both parties have provided consent for this filing.

## FACTUAL BACKGROUND

*Amici* adopt fully by reference herein the Statement of the Case in the Brief for Appellees at pages 2 through 12.

## SUMMARY OF ARGUMENT

IDEA mandates that children with disabilities receive a FAPE tailored to their unique academic and functional needs. The Supreme Court in *Endrew F.* clarified that an Individualized Education Program (IEP) must be reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. This standard requires ambitious and challenging goals, ensuring meaningful progress for students with disabilities, including functional goals critical to their educational advancement.

The factors used by the Fifth Circuit to evaluate FAPE compliance, as set forth in *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245 (5th Cir. 1997), must be applied in alignment with *Endrew F.'s* substantive standard. The first and fourth factors are in dispute in this case. Specifically, the first factor must assess whether the IEP includes appropriately ambitious goals and challenging objectives tailored to the student's unique circumstances. The fourth factor must evaluate whether the academic and non-academic benefits provided are sufficient in light of the child's individual needs and potential for growth. In this case, the intensity and frequency of services are at issue; the parents requested that ESY services be

provided for a full school day during any break of three days or more whereas the school district proposed just six weeks of ESY services for four hours a day. The parents were concerned that without more continuous education, their son regressed in the critical areas of toileting and elopement.

For students like I.M., whose educational programming necessarily includes functional goals related to elopement and toileting, progress on these goals is critical. To provide FAPE, therefore, the IEP must appropriately address those needs. The district court correctly emphasized the importance of these functional goals, recognizing that ignoring them would undermine the individualized nature of I.M.'s IEP. The regression I.M. experienced in these critical areas during breaks further highlights the insufficiency of the IEP in addressing his unique needs.

IDEA's purpose is to ensure equality of opportunity and independent living for individuals with disabilities. For I.M., the *Endrew F.* standard demands an IEP reasonably calculated to result in progress on the functional goals necessary for achievement of IDEA's statutory purpose, to prepare children with disabilities "for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

**ARGUMENT**

I. **IDEA REQUIRES THAT AN APPROPRIATE IEP BE REASONABLY CALCULATED TO MEET ALL EDUCATIONAL NEEDS, BOTH ACADEMIC AND FUNCTIONAL, OF A CHILD WITH A DISABILITY**

In 1975, with passage of the Education for All Handicapped Children Act, Pub. L. No. 94-142, 89 Stat. 773, IDEA's predecessor statute, Congress acted to guarantee that children with disabilities receive a quality public education, just as their peers without disabilities received. Hearings held by Congress in the 1970s investigating the educational instruction provided to children with disabilities established that public school districts throughout the country had wholly excluded millions of children with a multitude of disabilities or placed those children in programs where they received no educational benefit whatsoever. *Education for All Handicapped Children, 1973-74: Hearings on S.6 Before the Subcommittee on the Handicapped of the Senate Committee on Labor and Public Welfare,* 93d Cong., 1st Sess. (1973-74). At that time, statistics showed that "only 55 percent of the school-aged handicapped children and 22 percent of the pre-school-aged handicapped children [were] receiving special educational services." Senator Randolph, *Hearings on S. 6 before the Subcommittee on the Handicapped of the Senate Committee on Labor and Public Welfare*, 94th Cong., 1st Sess., 1 (1975).

Parents and educators testified about the widespread failure of states to provide the supportive services necessary to meet the needs of children with varying

degrees and forms of disabilities. Statistics compiled for Congress by the Office of Education at that time revealed that children of all ages and with a range of disabilities were affected. For example, pupils excluded or receiving inappropriate education included 82% of "emotionally disturbed" children; 82% of "hard-of-hearing" children; 67% of "deaf-blind" and "other multi-handicapped" children; and 88% of those classified "learning disabled." S. Rep. No. 168, 94th Cong., 1st Sess. 5-8 (1975) reprinted in 1976 U.S.C.C.A.N., 1425, 1429-32; H.R. Rep. No. 332, 94th Cong., 1st Sess. 11-12 (1975). IDEA therefore mandates appropriate educational programming for students who have a panoply of differing educational needs.

In exchange for IDEA funds, the States pledge "to comply with a number of statutory conditions. Among them, the State must provide a [FAPE] to all eligible children." *Endrew F.*, 580 U.S. at 390. FAPE requires delivery of "specially designed instruction . . . to meet the unique needs of a child with a disability" and related services, which "are the support services 'required to assist a child . . . to benefit from' that instruction." *Id.* (quoting 20 U.S.C. §§ 1401(26), (29)).

"[I]f personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied, the child is receiving a 'free appropriate public education' as defined by the Act." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 189 (1982). The "other items from the definitional

checklist" require that instruction and services: (i) "be provided at public expense and under public supervision"; (ii) "meet the State's educational standards"; (iii) "approximate the grade levels used in State's regular education"; and (iv) "comport with the child's IEP." *Id*.

"The IEP is 'the centerpiece of the statute's education delivery system.'" *Endrew F.*, 580 U.S. at 391 (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Id.* (quoting *Rowley*, 458 U.S. at 181).

The legislative history of IDEA confirms that Congress was aware that the statute must deliver appropriate and individualized programming to children with multiple types of disabilities implicating and creating quite diverse educational needs. To ensure that programming would address such varying disabilities, IDEA requires that children be assessed in all areas of potential need.

The first regulations implementing the statute included the requirement that a child be assessed in all areas of need although the IDEA itself initially did not contain that requirement. Mark C. Weber, *All Areas of Suspected Disability*, 59 Loyola L. Rev. 289, 299 (2013). That regulation was adopted by Congress. 20 U.S.C. § 1406(b)(2). The 1997 revision to the statute – IDEA – "elevated the regulation's language to statutory text and edited it to state that '[e]ach local educational agency shall ensure that the child is assessed in all areas of suspected

disability.'" Weber, 59 Loyola L. Rev. at 299 (quoting Pub. L. No. 105-17, § 101, 111 Stat. 37 (1997)). That revision included the "provision demanding goals and corresponding services to meet each of the child's educational needs." *Id.*

"The approach Congress took with these amendments was not to insist on a given level of intensity of services. Instead, Congress required a certain breadth of services – insisting that schools look for and find each area of need and put in place something to address it. Congress seemed to assume that once schools accurately identified needs and furnished services, the school personnel's own professionalism would kick in, and services provided would be effective." *Id.* at 300. Subsequent to 1997, courts "found violations of IDEA and ordered relief when an otherwise beneficial program lacks particular needed services," including but not limited to behavioral interventions. *Id.* at 304, 305 n.75.

*Endrew F.* considered this statutory language and unequivocally emphasized the need to address functional performance. *Endrew F.* recognized that IDEA "requires States to 'educate a wide spectrum' of children with disabilities and that 'the benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end.'" 580 U.S. at 394 (quoting *Rowley*, 458 U.S. at 202).

Taking into account the differing educational needs IDEA must address, *Endrew F.* articulated this standard: "To meet its substantive obligation under the

IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 399. To that end, "IDEA requires that every IEP include 'a statement of the child's present levels of academic achievement and *functional* performance,' . . . and set out 'measurable annual goals, including academic and *functional* goals,' along with a 'description of how the child's progress toward meeting' those goals will be gauged." *Endrew F.*, 580 U.S. at 391 (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(III)) (emphasis supplied).

And the "IEP must aim to enable the child to make progress," *Id.* at 391, on *all* goals. Referring back to the legislative purpose of the EHA, *Endrew F.* explained:

> After all, the essential function of an IEP is to set out a plan for pursuing academic and *functional* advancement. *See* §§ 1414(d)(1)(A)(i)(I)-(IV). This reflects the broad purpose of the IDEA, an ambitious piece of legislation enacted in response to Congress' perception that a majority of children in the United States were either totally excluded from schools or were sitting idly by in regular classrooms awaiting the time when they were old enough to drop out. *Rowley*, 458 U.S. at 179 (quoting H.R. Rep. No. 94-332, p. 2 (1975). A substantive standard not focused on student progress would do little to remedy the pervasive and tragic academic stagnation that prompted Congress to act.

580 U.S. at 399-400 (quoting) (cleaned up).

Referring to functional goals as "non-academic" goals implies that they do not implicate educational needs. The language in *Endrew F.* could not be clearer, however. For children like I.M., their educational needs encompass functional goals,

and they are entitled to IEPs reasonably calculated for them to make progress on those goals:

> That the progress contemplated by the IEP must be appropriate in light of the child's circumstances should come as no surprise. A focus on the particular child is at the core of the IDEA. The instruction offered must be "*specially* designed" to meet a child's "*unique* needs" through an "[*i*]*ndividualized* education program." §§ 1401(29), (14). It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth.

580 U.S. at 400 (emphasis in original).

There are scores of children like I.M., whose educational program includes services and goals to meet functional needs. Progress on these functional goals is essential for these students to be able to meet IDEA's statutory goal of preparing students for "further education, employment, and independent living." See 20 U.S.C. § 1400(d)(1)(A). As the Supreme Court has held, "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Endrew F.*, 580 U.S. at 404. Therefore, the IEP needs to be "reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Id*. For a student like I.M., who has the capacity to achieve independence in toileting and to reduce or even eliminate elopement, the IEP needs to be reasonably calculated to enable the child to make progress in those areas.

*Endrew F.* soundly rejected the argument that merely more than *de minimis* progress is sufficient for any goal, including functional goals. *Endrew F.*, 580 U.S. at 402.

## II. COURTS MUST APPLY THE *MICHAEL F.* FACTORS IN A MANNER THAT IS CONSISTENT WITH *ENDREW F.*

### A. *Endrew F.* Clarified the Robust Substantive Standard for Evaluating FAPE Claims

Congress passed IDEA's predecessor, the EHA, in part, to end the exclusion of most students with disabilities from public schools. Perhaps because the backdrop for the passage of this landmark legislation was the 1960s and 1970s trend towards remediation of exclusionary policies based on race and disability, educational policy for students with disabilities at this time was focused primarily on *access* rather than on what actually *happened* in the classroom. Through this lens, the Supreme Court's conclusion that the 'basic floor of opportunity' provided by the Act consists of *access to specialized instruction and related services* which are individually designed to provide educational benefit to the handicapped child," *Rowley*, 458 U.S. at 201 (emphasis added), is understandable.

But since the early 1980s, our nation's broader education policy has matured from one seeking mere access to education to one that requires substantive and achievement-driven measures to ensure that our students receive a quality and effective education. *See* Brief for Council of Parent Attorneys and Advocates, et al.

as Amici Curiae in Support of Petitioner, *Endrew F. v. Douglas Cent. Sch. Dist. RE-1*, at 10-17.[3]

Thus, in 2017, when the Supreme Court decided *Endrew F.*, it clarified that IDEA requires a more robust standard for the level of educational benefit in order for a student to receive a FAPE. In requiring "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," the Supreme Court soundly rejected the Tenth Circuit's incorrect lower "merely more than *de minimis*" standard. *Endrew F.*, 580 U.S. at 402. Further, the Court emphasized that in order for a student to receive FAPE, the IEP must be "appropriately ambitious," and the objectives must be "challenging." *Id.* at 999-1000. Accordingly, courts that do not apply the more demanding *Endrew F.* standard, commit legal error.

*Endrew F.* had a profound impact on the FAPE standard application across the country. For consistency, the U.S. Department of Education has taken post-decision steps to provide clarification to parents and educators alike. On December 7, 2017, the United States Department of Education released *Questions and Answers (Q&A) on U.S. Supreme Court Case Decision Endrew F. v. Douglas County School District RE-1* (Dec. 7, 2017), *available at* https://sites.ed.gov/idea/files/qa-

---

[3] Available at https://www.scotusblog.com/wp-content/uploads/2016/11/15-827-amicus-petitioner-Council_of_Parent_Attorneys_and_Advocates.pdf (last viewed March 28, 2025).

endrewcase-12-07-2017.pdf (last viewed March 26, 2025). As the Q&A acknowledged, the Court's clarification of a school's substantive obligation under IDEA, "reinforced the requirement that 'every child should have the chance to meet challenging objectives.'" (Q&A No. 3). The use of the word "*reinforced*" by the Department demonstrates that the substantive standard clarified by the Court in *Endrew F* is a standard that schools should have been providing all along to every child with a disability. *Id.*

The guidance from the Department of Education also makes clear that "[t]here is no 'one-size-fits-all' approach to educating children with disabilities." (Q&A No. 17). Instead, as the Court acknowledged in *Endrew F.*, education planning requires a process of considering students' individual potential, presentation, and needs against their ability to meet the rigorous state educational standards established for all students and for IEP teams to determine when adherence to those general education standards may not be a reasonable expectation at that given time. "After all, the essential function of an IEP is to set out a plan for pursuing academic and *functional* advancement. *Endrew F.,* 580 U.S. at 399 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV)).

To that end, IDEA's procedural requirements that IEP teams consider the child's "present levels of academic achievement and functional performance" and describe "how the child's disability affects the child's involvement and progress in

the general education curriculum." *Id.* at 400. Examining IDEA's procedural requirements is not solely for the purpose of determining procedural compliance with IDEA, *but rather,* to evaluate whether a child has, substantively, received a FAPE.

Thus, while the procedural inquiry remains the same, *Endrew F.* made clear that there were distinct measures to be considered when evaluating whether an individual student had, substantively, been denied a FAPE. *Id.* at 401-02. Specifically, *Endrew F.* made clear that for those students with disabilities who are able to make grade level progress in the standard general education curriculum required of all students, the *Rowley* guidance for measuring progress remains appropriate in evaluating whether meaningful educational benefit was conferred. *Id.* at 401. As set forth in *Rowley,* students accessing the general education curriculum rely on the fact that "[r]egular "examinations are administered, grades are awarded, and yearly advancement to higher grade levels is permitted for those children who attain an adequate knowledge of the course material. The grading and advancement system thus constitutes an important factor in determining educational benefit." 458 U.S. at 203. Indeed, the Court acknowledged that with the general education curriculum framework, "the system itself monitors the educational progress of the child." *Id.* As a result, for children with disabilities who can be educated in the regular classroom, IDEA "*typically* aims for grade level advancement." *Id.* at 402

(emphasis added). However, the Supreme Court specifically reiterated the caveat previously stated in *Rowley* and noted that it had "declined to hold in Rowley, and do no hold today, that 'every handicapped child who is advancing from grade to grade is automatically receive a [FAPE]." *Endrew,* 580 U.S. 402 n.2 (*quoting Rowley,* 458 U.S. at 203 n.25).

Even for a student in general education classes, passing grades in those classes *alone* does not establish that a student is receiving FAPE. *Id.* For a student like I.M., who is in a separate, self-contained setting where progress is monitored on both academic *and* functional goals, failing to develop an IEP that provides for the adequate progress on functional goals implicates a critical component of his program.

**B. *Endrew F.* Requires that the *Michael F.* Factors Be Applied so as to Require IEPs to Contain Ambitious Objectives and Challenging Goals with Progress Evaluated in Light of a Student's Unique Circumstances**

In 1997, this Court set out a four-factor test for determining whether a school district had complied with the FAPE requirement, with the fourth factor focusing on the substantive standard for FAPE. The four factors are: "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) positive academic *and non-academic* benefits are demonstrated." *Michael F.,*

118 F.3d at 253 (emphasis supplied). In *E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 765 (5th Cir. 2018), this Court held that "*Endrew F.* provides more clarity for what constitutes an appropriate IEP, but it does not render the *Michael F.* factors inapplicable."

In particular, courts must apply the first and fourth factors consistently with *Endrew F*'s requirements in mind. The first factor in *Michael F.* requires a court to assess whether an IEP was individualized to fit the student's assessments and performance. *Michael F.*, 118 F.3d at 253; ROA.2906, RE at Tab 4. But *Endrew F.* has made clear that merely being "individualized" is not a sufficient indicator of FAPE. Rather, the IEP must "be appropriately ambitious in light of [the student's] circumstances." 580 U.S. at 402. And the student must also "have the chance to meet challenging objectives." *Id.*

Post *Endrew F.*, the way a school district offers an IEP reasonably calculated to enable the child to obtain meaningful benefit in light of the child's circumstances is by following the procedures set out in 20 U.S.C. § 1414. These "procedures are there for a reason, and their focus provides insight into what it means, for purposes of the FAPE definition, to 'meet the unique needs' of a child with a disability." 580 U.S. at 402. Thus, the *Endrew F.* court soundly rejected the school district's argument that "these provisions impose only procedural requirements—a checklist of items the IEP must address—not a substantive standard enforceable in court." *Id.*

Instead, to determine whether an IEP is appropriately individualized, courts must assess whether the IEP takes into account the child's unique circumstances, "constructed only after consideration of the child's present levels of achievement, disability, and potential for growth." 580 U.S. at 400.

Here, there was no dispute that I.M. required goals that addressed both toileting and elopement; the IEP included such goals. The dispute was over whether the services in the IEP were sufficient when the record reflected that the student regressed in these critical areas during school breaks. Both the hearing officer and the district court found that I.M.'s IEP needed to include two additional weeks of educational services to be reasonably calculated to address these goals and avoid regression.

The district court correctly determined that, for a student like I.M., focusing on academic goals would not result in an appropriately individualized IEP. "Given that I.M.'s non-academic goals in his IEP were also of great importance to his receiving a FAPE, . . . the SEHO's focus on I.M.'s elopement and toileting was warranted in this case." ROA.2911, RE at Tab 4. The district court correctly upheld the hearing officer's determination that the two additional weeks of education were required for I.M. to make adequate progress on these critical goals.

The Supreme Court in *Endrew F.* stated that school district should "be able to give a cogent and responsive explanation for their decisions that shows the IEP is

reasonably calculated to enable the child to make progress appropriate in light of his circumstances." 580 U.S at 404. NEISD takes the position that an IEP is sufficient if the child makes some progress on goals and objectives other than those at issue in the case. NEISD has failed to provide a cogent and responsive explanation for rejecting the decision of the hearing officer and the district court that, for I.M., progress on toileting and elopement is critical and that an additional two weeks of education is required for him to make progress.

The record reflected that I.M. regressed in toileting and elopement when there were significant breaks in educational services. This Court in *Michael F.* made clear that an appropriate IEP must be designed to avoid regression; the Court stated, "an IEP must be likely to produce progress, not regression or trivial advancement." *Michael F.*, 118 F.3d at 248 (quoting *Board of Educ. of East Windsor Regional Sch. Dist. v. Diamond*, 808 F.2d 987, 991 (3d Cir. 1986)). When students regress, that means that they start the new school year at a lower level that when the prior school year ended, and need additional time to return to the prior level before those students can make progress. For students at risk of regression on critical functional skills, education beyond the standard school day may be required. Indeed, as this Court has recognized, a residential program may be required to provide FAPE to students based on their individual needs. *See Richardson Indep. Sch. Dist. V. Michael Z.*, 580 F.3d 286, 298 (2009); *see also* 34 C.F.R. § 300.302. Here, I.M. was entitled to

an IEP that was reasonably calculated for him to make progress and avoid regression on critical goals of toileting and elopement. Whether the IEP was reasonably calculated to result in progress on other goals is wholly irrelevant.

Under the fourth *Michael F.* factor, an IEP that provides for regression on critical skills is inappropriate even if there are some positive academic and non-academic benefits. The fourth *Michael F.* factor asks whether positive academic and non-academic benefits have been demonstrated, but it does not provide that an IEP that is calculated to allow for regression on critical goals is appropriate just because the student may make progress on other goals and objectives. In fact, as noted above, *Michael F.* unequivocally and specifically indicated that a program resulting in regression or trivial advancement does not constitute a FAPE.

Given I.M.'s record of regression during school breaks, the failure to include the additional two weeks of education ordered by both the hearing officer and the district court rendered the IEP inappropriate for I.M. IDEA imposes obligations on schools to "remedy the pervasive and tragic academic stagnation" that prompted the "ambitious" IDEA. 580 U.S. at 400. As the Supreme Court explained:

> When all is said and done, a student offered an educational program offering "merely more than *de minimis*" progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to "sitting idly . . . awaiting the time until they were old enough to 'drop out.'" *Rowley*, 458 U.S. at 179. The IDEA demands more.

580 U.S. at 402-03.

Regarding the fourth *Michael F.* factor, "it was clearly documented that I.M. experienced regression" on his functional goals "on breaks longer than several days. ROA.2912, RE at Tab 4. As a result, his IEPs were not sufficiently individualized "given I.M.'s circumstances – including his toileting and alarming elopement behaviors." *Id.*

IDEA seeks to improving educational results for school children with disabilities because that "is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. § 1400(c). For I.M., progress on functional goals was at the heart of educational programming designed to result in achievement of this statutory purpose.

Significantly, NEISD's principal argument is that it is not required to design an IEP that addressed the I.M.'s record of regression on the critical skills of toileting and refraining from elopement as long as the IEP enabled I.M. to make progress on other goals, particularly academic goals. But given the IDEA's goal of preparing students for "further education, employment and independent living," 20 U.S.C. § 1400(d)(1)(A), there is no statutory basis for discounting the importance of the need for progress, and avoiding regression, in functional skills.

*Amici* know well that equipping a child with a disability who has the capacity to be independent in toileting and to refrain from elopement with those skills is of critical importance for their opportunities in employment and independent living after their entitlement to special education ends. When the school district is aware of regression in these important skills during periods without schooling, the school district is required to take steps to prevent regression, such as by providing for extending the ESY program beyond the ordinary period based on the student's individual needs.

Here, the district court and the SEHO correctly held that the school district's IEP did not meet the test set out in *Michael F.* The district court's decision should be affirmed.

## CONCLUSION

For the forgoing reasons, COPAA and TOPAA respectfully request that the Court affirm the district court's decision.

Respectfully submitted this the 11th day of April 2025.

/s/ Selene Almazan-Altobelli
Selene Almazan-Altobelli
Catherine Merino Reisman
Ellen Saideman
Council of Parent Attorneys and Advocates
PO Box 6767
Towson, Maryland 21285

Attorneys for *Amici Curiae*

# CERTIFICATE OF SERVICE

The undersigned certifies that on April 11, 2025, the foregoing document was electronically filed in the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system, which will transmit an electronic copy to all counsel of record.

/s/ Selene Almazan-Altobelli
Selene Almazan-Altobelli

# CERTIFICATE OF COMPLIANCE

The undersigned certifies:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 4,957 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac, Times New Roman, font size 14.

/s/ Selene Almazan-Altobelli
Selene Almazan-Altobelli

# CERTIFICATE OF PRIVACY REDACTIONS AND VIRUS SCANNING

The undersigned certifies that (1) all required privacy redactions have been made in this brie, in compliance with 5th Cir. R. 25.2.13; the electronic submission is an exact copy of the paper document in compliance with 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ Selene Almazan-Altobelli
Selene Almazan-Altobelli

## CERTIFICATE OF CONFERENCE

In accordance with 5th Cir. R. 27.4, the undersigned certifies that March 24, 2025, consent to file an amicus curiae brief was sought from parties' counsel. Counsel for both parties have consented to the filing.

/s/ Selene Almazan-Altobelli
Selene Almazan-Altobelli